IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Nationwide Life and Annuity Insurance Company, <br><br> Plaintiff, <br><br> v. <br><br> Kerry Becker, <br><br> Defendant. | Case No. 08-CV-2232 <br><br> Judge James B. Zagel |

**PLAINTIFF NATIONWIDE'S MOTOIN FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**

Plaintiff Nationwide Life and Annuity Insurance Company, for its motion for judgment as a matter of law pursuant to Rule 50, or in the alternative, for its motion for a new trial pursuant to Rule 59, states as follows:

**I.  Introduction**

The dispute between Nationwide and Kerry Becker culminated in a one-week trial, commencing with jury selection on a Monday morning. In the short trial Nationwide presented the testimony of only four witnesses and Becker presented the testimony of only two witnesses, one of whom was Becker herself. Excluding jury selection, the trial itself took approximately 2-½ days, and then the jury deliberated for the remainder of the week, returning their verdict in favor of Becker at the end of the day on Friday.

The Court aptly noted that the trial was about the conclusion to be drawn from largely undisputed facts. Gregory Yarbrough ("Yarbrough") died from a drug overdose less than two years after Nationwide issued a life insurance policy to him. Nationwide had no obligation to pay the policy's death benefit if Yarbrough committed suicide within that two-year period. The

medical examiner who examined Yarbrough's body after his death concluded that he committed suicide. Becker, the policy beneficiary, argued that the death was accidental.

Nationwide moves for a judgment as a matter of law pursuant to Rule 50, or, in the alternative, for a new trial pursuant to Rule 59 on two grounds—the verdict was unsupported by sufficient evidence, and was in fact against the manifest weight of the evidence, and Becker's counsel made improper, inflammatory and highly prejudicial statements during his closing argument.

This was a case in which the weight of the evidence favored Nationwide: There was abundant evidence that Yarbrough's life was spinning out of control prior to his death and was rapidly spiraling downward, and that he dies after taking at least 57 cyclobenzaprine bills. Regardless, Becker obviously hoped to benefit from her status as a widow and mother of young children whose husband, Yarbrough's business partner, died in a tragic boating accident. Also, she obviously hoped to benefit from the fact that her legal dispute was with the insurer, and that refused to pay the policy's death benefit to her based on its conclusion that Yarbrough—someone else's husband—committed suicide. That is perfectly fine; Becker was well within her rights to capitalize on who she is, what her circumstances are, and who she was litigating against—but only within the clearly defined trial rules. But when Becker's counsel breached those rules in an egregious manner, in a very short trial with very few witnesses, and in a closing argument made just before the jury began their deliberations, and with no curative instruction possible from the Court, Nationwide suffered significant, uncured and incurable prejudice.

## II. Threshold Issues

    **A.** **Because The Trial Transcript Will Not Be Available Until At Least September 28, Nationwide Requests Additional Time In Which To File A Supplemental Memorandum Of Law In Support Of Its Post-Trial Motion.**

2

On July 20, 2012, immediately after the jury returned a verdict in favor of Becker on the payment issue, the Court asked Nationwide's counsel whether Nationwide intended to file a motion for a new trial, stating that Nationwide would have six weeks in which to file that motion. Nationwide's counsel responded in the affirmative. On July 24, the Court entered the following minute order: "Post trial motion deadline set for 8/31/2012. Response to post trial motions deadline 9/19/2012. Status hearing set for 9/20/2012 at 10:00 a.m."

Nationwide's counsel made an online request for the trial transcript. At the end of last week the official court reporter advised Nationwide's counsel that the transcript cannot be provided before September 28 due to preparation of other, more urgent transcripts. Accordingly, Nationwide requests that this Court modify the briefing schedule on Nationwide's post-trial motion, allowing Nationwide to file an additional brief as appropriate following receipt of the trial transcript.

    **B.**     **The Court Mistakenly Entered a Form AO 450 "Judgment In Civil Action"—Which Reflects A Final And Appealable Judgment—Even Though The Trial Did Not Dispose Of All Claims Against All Parties And Therefore Did Not Result In A Final And Appealable Judgment; The Court Should Vacate That Form AO 450 "Judgment In Civil Action."**

At the outset of the jury trial of this matter there were three issues:

(1)     Is Nationwide obligated to pay the life insurance policy's death benefit to defendant Becker?

(2)     If Nationwide is obligated to pay the life insurance policy's death benefit to Becker, how much prejudgment interest does Nationwide owe Becker?

(3)     Did Nationwide act in "bad faith" in refusing to pay the death benefit to Becker?

Becker presented no evidence in support of her bad faith claim, and before that claim went to the jury she voluntarily dismissed it, leaving only the payment and prejudgment interest issues. Further, prior to the trial the parties and the Court agreed that the Court would address the

3

prejudgment interest issue as a matter of law if Becker prevailed (and therefore the issue would not be submitted to the jury, and if it was not rendered moot by the verdict it would be addressed by the Court post-trial).

As noted above, on July 24 the Court entered a minute order stating that Nationwide's post trial motion was due on August 31. Also on July 24, in a separate minute order, the Court entered judgment in favor of Becker, employing a Form AO 450 "Judgment in Civil Action." The "Judgment in Civil Action" states that "The court has ordered that … [j]udgment is entered in favor of defendant Kerry Becker and against plaintiff, Nationwide Life and Annuity Insurance Company."

Clearly, the Court intended to allow Nationwide to file the post-trial motion that Nationwide was asked about filing, and stated it intended to file. Just as clearly, the Court did not intend to enter a "Judgment in Civil Action," which has jurisdictional implications and is utilized when there is a final and appealable judgment resolving all claims against all parties. There has been no final decision that ended the litigation on the merits and left nothing for the Court to do but execute the judgment.

Further evidencing the parties' understanding that there was no final judgment here, on July 31, Becker filed a "Motion for Judgment." On August 2, Becker presented that motion, and the Court deemed it premature, entering—also on August 2—a minute order that states: "For the reasons stated in open court, the motion for entry of judgment is entered and continued until further order of court." Becker's July 31 motion, and the Court's oral ruling and minute order on August 2, are all inconsistent with the notion that the Court had already issued a final and appealable judgment in this matter.

Nationwide believes the Court entered the "Judgment in Civil Action" mistakenly, and that the Court can and should vacate that judgment now,[1] and that it should enter a final judgment only once it has resolved all of Becker's pending claims—that is, once the Court has also addressed the still-pending prejudgment interest issue and can enter a money judgment.

## III. Motion for Judgment as a Matter of Law

### A. Legal Standards

"If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, cross-claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue." *Garrett v. Barnes*, 961 F.2d 629, 631 (7th Cir. 1992); *see also* Fed. Rule Civ. Proc. 50.

### B. There is No Legally Sufficient Evidentiary Basis for the Verdict.

A reasonable jury could not have concluded that Yarbrough did not commit suicide on the basis of the evidence adduced by Becker. As discussed below, Becker's "evidence" consisted of nothing more than confusing and unsupported theories. Becker's conclusion – that Yarbrough's overdose of more than 57 pills of cyclobenzaprine as accidental – relied not on rebutting the overwhelming evidence in favor of suicide, but rather by simply claiming that Yarbrough was a "pill popper" and calling into question whether he was really depressed. This strategy was apparently successful in confusing the jury, in particular following defense

---

[1] The applicable Rule is not totally clear. Because the "Judgment in Civil Action" certainly was a mere clerical error, Rule 60(a) ("Corrections Based on Clerical Mistakes; Oversights and Omissions") seems facially relevant. Alternatively, although the "Judgment in Civil Action" suggests there is a final and appealable judgment, there is no final and appealable judgment here, so Rule 54(b) should allow the Court to revise (vacate) the judgment in light of the fact that it is not final and appealable.

counsel's inappropriate appeals to the jury's passion, but it does not constitute evidence which can form the basis of a verdict for a reasonable jury, and accordingly the jury verdict should be set aside, and judgment should be entered as a matter of law in favor of Nationwide.

IV.     **Motion for a New Trial**

    A.     **Legal Standards**

"A new trial may be granted if the verdict is against the clear weight of the evidence, the damages are excessive or the trial was unfair to the moving party." *Miksis v. Howard*, 106 F.3d 754, 757 (7th Cir. 1997) (citing *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 636 (7th Cir. 1996), and *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir. 1992)). The district court has broad discretion to order a new trial. *See Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir. 1989) (citing *General Foam Fabricators v. Tenneco Chemicals, Inc.*, 695 F.2d 281, 288 (7th Cir. 1982)).

In considering a Rule 59 motion for a new trial, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).

    B.     **The Verdict Was Against the Manifest Weight of the Evidence.**

There was overwhelming evidence at trial that Yarbrough intended to commit suicide and did commit suicide, including the following: Yarbrough took more than 57 pills of cyclobenzaprine, and in the span of time leading up his overdose he told his wife Lesia that he was depressed, he would sit up crying all night, he warned his wife that she should be strong because he would not always be around, he was very upset that Becker (who, after her husband's death, had become Yarbrough's business partner) sued Yarbrough from stealing from the business, he had been recently re-arrested for cocaine possession in violation of his probation,

6

with potentially grave consequences, and finally, his body was discovered on the very day he was scheduled to appear in criminal court in connection with that re-arrest.

Further, the San Diego Medical Examiner, Dr. Bethann Schaber, who conducted the autopsy and investigation into Yarbrough's death independently in the course of her regular duties, well prior to the filing of this suit, testified to her unequivocal conclusion that Yarbrough committed suicide. Dr. Schaber explained that Yarbrough took at least 57 cyclobenzaprine pills and that someone does not "accidentally" take such a large number of pills unless they intend to die. Further, Yarbrough's wife testified about Yarbrough depression and overall mental status, and about her belief that he committed suicide.

Faced with overwhelming evidence that Becker could not rebut, she chose to obfuscate and confuse. Becker presented the testimony of only two witnesses. Becker herself testified at length about the business's credit card statements, which—she asserted—showed excessive "vacations" and misuse of business funds by Yarbrough. How this evidence supported her theory of the case—that Yarbrough's death was accidental—is unclear, but she presumably wanted to suggest that Yarbrough was "living large" and enjoying life rather than depressed and ultimately suicidal. Certainly, the evidence concerning misappropriation of funds by Yarbrough did not rebut the overwhelming evidence in favor of suicide presented by Nationwide, and, if anything, further supported Nationwide's contention that Yarbrough was out of control during the final months of his life as his world came crashing down on him.

Additionally, Becker testified that after Yarbrough's misappropriation of business funds, she sued him approximately a month before he died. She testified that Yarbrough was very upset about the lawsuit, calling her approximately 20 times a day and repeating himself endlessly.

7

Finally, Becker's theory of the case, as proclaimed during the opening statement—that Yarbrough was a "pill-popper"—was ultimately without any evidentiary support aside from Becker's own self-interested testimony, and even then, despite her long relationship with Yarbrough, her husband's best friend and business partner, all she could offer to support the "pill-popper" label is that she had seen him take an unknown number of an unknown type of pills once, after he was injured in a motorcycle accident in which the motorcycle landed on top of him. Those pills could have been Ibuprofen. There was no "pill-popping" evidence in the record, and, in fact, no evidence of Yarbrough taking or abusing pills, except for the more than 57 cyclobenzaprine pills that resulted in his death.

Becker's only other testifying witness was Dr. Mitra Kalelkar, who was hired by Becker to provide an expert opinion. Dr. Kalelkar opined that from the standpoint of a forensic pathologist Dr. Schaber should not have characterized Yarbrough's "manner of death" as suicide. However, even Dr. Kalelkar recognized that there was substantial evidence in favor of suicide. She testified that there was *at least* a 50% chance that Yarbrough committed suicide. A concession of this magnitude, by Becker's own expert, in a case being decided on the preponderance of the evidence standard, is extraordinary. Under that preponderance standard, Dr. Kalelkar provided 50% of that proof that Nationwide needed in order to prevail—and all that Nationwide needed to prove was an iota beyond that 50%. That iota could have come from a variety of sources in this case. One notable example: Dr. Kalelkar testified that, in arriving at her opinion, she did not believe that there was any evidence that Yarbrough had exhibited "preparations for death, in appropriate to or unexpected in the context of the decedent's life." And yet, when confronted with Yarbrough's wife's testimony that Yarbrough had been reaching out to old friends that he had not talked to for a long time, and had told his wife that she would

have to be strong and that he would not always be around, Dr. Kalelkar conceded that there was evidence that Yarbrough may have been preparing for his death. Obviously, then, if Dr. Kalelkar testified that there was at least a 50% chance that Yarbrough committed suicide based on the facts she assumed to be true, and if she then agreed that some of the facts she assumed to be true were untrue *and* were supportive of a finding that Yarbrough committed suicide, then how can Nationwide not prevail as a matter of law under a preponderance standard?

In short, a party's "hired gun" is not expected to agree with the other side, and to provide 99.99% of the evidence needed for the plaintiff to establish its case. And given Dr. Kalelkar's testimony, along with the overwhelming evidence in favor of suicide presented by Nationwide (Yarbrough took more than 57 pills, Dr. Schaber concluded that he committed suicide, and so did his own wife) the jury could not have reasonably found under a preponderance standard that Yarbrough's death was not a suicide.

**C. Counsel For Defendant "Went Too Far" In His Closing Argument, And Successfully Inflamed The Passions Of The Jury And Confused Them Just Before They Began Their Deliberations.**

Inappropriate conduct and statements made by counsel during closing argument can provide the basis for a new trial. *See, e.g., Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 644-46 (7th Cir. 1995); *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 794-95 (1992); *Pleasance v. City of Chicago*, 396 Ill. App. 3d 821, 828 (1st Dist. 2009). Where statements made during closing argument are plainly unwarranted and clearly injurious, the Court should order a new trial. *Gruca*, 5 F.3d at 644.

Faced with considerable evidence that Yarbrough committed suicide, Becker decided to appeal to raw emotion. In Becker's closing argument, her counsel attempted to portray Becker as a sympathetic widow struggling to raise two children who had been preyed on (and were still

9

being preyed on) by both the Yarbroughs. This was part of Becker's tack—to confuse the jury and to make them think that the trial was actually a dispute between the Yarbroughs and Becker, and was in essence a continuation of Becker's prior lawsuit against Yarbrough.

But the defense went further, and made unwarranted and injurious comments which prejudiced the plaintiff. The defense viciously and inappropriately attacked Yarbrough's wife, whose testimony formed a substantial portion of the overwhelming evidence in favor of suicide. The inappropriate attack on Yarbrough's wife focused not on any evidence in the record, but invited the jury to imagine Yarbrough as a monster:

> [MR. CARUSO]: Very clever of them to send in that nice lady all dressed up. She was very classy, read very well. That wasn't Lesia Yarbrough. If you want to imagine Lesia Yarbrough, close your eyes, remember that testimony, and imagine your worse neighbor, the one that calls the police on you, someone who is just a backstabbing mean person –
>
> MR. EBNER: Your Honor, I object to the argumentative nature, inappropriate nature of the argument here.
>
> THE COURT: I think you went too far. The objection is sustained.

Transcript at 37-40 (Attached as Exhibit A).[2] This was the final image put into the "jury's head" of one of Nationwide's most important witnesses. Although the Court sustained Nationwide's objection and told defense counsel that he had "gone too far," the damage was done, the jury was confused, and there was no way to un-do the resulting prejudice.

Not content to inappropriately attack the testimony of Nationwide's witnesses, Becker's counsel also inappropriately invited the jury to speculate about the testimony of witnesses who were not presented. For example, in his closing argument Becker's counsel asked the jury to

---

[2] Although the court reporter has informed counsel for Nationwide that she cannot complete the trial transcript before September 28, 2012, soon after closing arguments she did provide a four-page excerpt from the trial transcript that is attached as Exhibit A. To be clear, no additional portions of the transcript have been provided to Nationwide as of the date of this filing.

10

consider why Nationwide did not call Yarbrough's mother as a witness. Again, Nationwide objected to these inappropriate comments, and the Court sustained the objection, but there was no way to un-do the damage.

Either one of these inappropriate comments by defense counsel can explain why the jury apparently struggled, over two days of deliberations, with the overwhelming evidence in favor of suicide. In a case where the impact of the evidence was already somewhat lessened, perhaps in the jury's eyes, by the visceral inequity of a widow with young children battling with an insurer, and a decedent whom she testified had caused her so much grief, there was absolutely no room for these inappropriate comments. Accordingly, the Court should exercise its discretion and order a new trial, one that is conducted entirely within the relevant rules, and if not perfect, at least fair.

**V.    Conclusion**

For the reasons stated above, Nationwide respectfully requests that this Court:

1) vacate the order dated July 23 which purported to enter a final and appealable judgment;

2) set aside the jury's verdict and enter judgment as a matter of law in favor of Nationwide, or, in the alternative, set aside the jury's verdict and order and new trial; and

3) grant such other and further relief as it deems just under the evidence and circumstances.

August 31, 2012                    Respectfully submitted,

                                      s/ Ronald L. Ohren
                                      Ronald L. Ohren
                                      Jonathan H. Ebner
                                      BAKER & McKENZIE LLP
                                      300 E. Randolph Drive
                                      Suite 5000
                                      Chicago, IL  60601
                                      Telephone: (312) 861-8854
                                      Facsimile:  (312) 861-2899

CHIDMS1/3074956.1